Faryion Edward WARDRIP, Appellant,

v.

The STATE of Texas.

No. 73,671.

Court of Criminal Appeals of Texas,
En Banc.

Oct. 3, 2001.

Thomas L. Allensworth, Wichita Falls, for Appellant.

Barry L. Macha, DA, Gerald W. Taylor, Asst. DA, Rick L. Mahler, Asst. DA, John W. Brasher, Asst. DA, Wichita Falls, for State.

PER CURIAM.

Appellant was convicted of capital murder on November 5, 1999. TEX. PENAL CODE ANN. § 19.03(a)(2). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure article 37.0711 § 3(b) and § 3(e), the trial judge sentenced appellant to death. Art. 37.0711 § 3(g).[1] Direct appeal to this Court is automatic. Art. 37.0711 § 3(j). Appellant raises two points of error chal-

1. Unless otherwise indicated, all future references to Articles refer to Code of Criminal Procedure.

lenging the sufficiency of the evidence at the punishment phase. We will affirm.

## DELIBERATENESS SPECIAL ISSUE

In his first point of error, appellant claims the evidence is insufficient to support the jury's affirmative answer to special issue number one, "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result." This special issue is no longer submitted in trials of offenses that were committed on or after September 1, 1991. *See* Art. 37.071, §§ 2(b) & (g). But it is submitted if the offense was committed before that date. *See* Art. 37.0711, §§ 1 & 3(b)(1). This capital murder was committed on December 21, 1984.

Although appellant argues that the evidence of deliberateness is *legally* insufficient, he urges us to extend the *factual* sufficiency standard announced in *Clewis v. State*, 922 S.W.2d 126 (Tex.Crim.App. 1996), to our review of the deliberateness special issue.

Appellant acknowledges that we have repeatedly declined to conduct a factual sufficiency review of the future dangerousness special issue. *McGinn v. State*, 961 S.W.2d 161, 169 (Tex.Crim.App.), *cert. denied*, 525 U.S. 967, 119 S.Ct. 414, 142 L.Ed.2d 336 (U.S.1998). When reviewing the future dangerousness special issue, we have employed the legal sufficiency standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *McGinn*, 961 S.W.2d at 169.

We view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *Chambers v. State*, 866 S.W.2d 9, 16–17 (Tex. Crim.App.1993), *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994).

In *McGinn*, we stated that "future dangerousness is, in essence, an issue of prediction," as opposed to "an issue of historical fact." [2] 961 S.W.2d at 168. We explained: "Findings of historical fact are either right or wrong at the time of trial. But, predictions are not right or wrong at the time of trial—they may be shown as accurate or inaccurate only by subsequent events." *Id.* We held that a *Clewis* review of the future dangerousness issue is impossible because it would require us to assign some evidence mitigating value and to substitute our judgment for that of the jury. *Id.* We concluded that the *Jackson* standard should instead be used because it views the evidence in the light that supports the jury's verdict and asks only whether circumstances are present that a rational person somewhere could find a probability of future dangerousness beyond a reasonable doubt. *Id.*

■■■ Deliberateness, unlike future dangerousness, requires a finding of historical fact that is either right or wrong at the time of trial. It is distinguishable

---

**2.** As we stated in *McGinn*, only one of the cases cited in *Clewis* demonstrated that a factual sufficiency review may have been applied to a punishment issue. 961 S.W.2d at 167. That case involved the sufficiency of the evidence to sustain a jury finding of "malice" in a murder case in which the defendant was given the death penalty. *Villareal v. State*,

140 Tex.Crim. 675, 146 S.W.2d 406 (App. 1940), *overruled on other grounds, Mays v. State*, 563 S.W.2d 260, 264 n. 5 (Tex.Crim. App.1978). We distinguished *McGinn* from *Villareal* by stating that "malice" was an issue of historical fact, but future dangerousness is an issue of prediction. *McGinn*, 961 S.W.2d at 168.

from future dangerousness because it involves an assessment of events that have already occurred. A *Clewis* review of deliberateness would not present the problems discussed in *McGinn.* Hence, we hold that the deliberateness special issue may be reviewed for factual sufficiency using the *Clewis* standard.[3]

■ In our review of the factual sufficiency of the evidence, we view all the evidence without the prism of "in the light most favorable to the verdict" and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Jones v. State,* 944 S.W.2d 642, 647 (Tex.Crim. App.1996), *cert. denied,* 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997); *Clewis,* 922 S.W.2d at 129. Appellant pleaded guilty to the capital murder of Terry Sims. The State presented evidence of the offense during the punishment phase of the trial. Leza Boone, Sims' friend and coworker, testified that she and Sims finished working their shifts at Bethania Hospital in Wichita Falls at approximately 11:15 p.m. on the night of December 20, 1984. They planned to exchange Christmas gifts at the home of a friend after work and Sims was to stay at Boone's residence that night to help her study for her final exam the following day. Boone was unexpectedly called to return to the hospital to work the next shift, so she drove Sims to Boone's residence after the Christmas gift exchange. She dropped Sims off at approximately 12:30 a.m. on December 21, 1984.

Boone finished her shift at the hospital at approximately 7:15 a.m. and returned to her residence. Sims did not answer the door, so Boone obtained a key from her landlord who lived two doors down. Boone opened the door and noticed that the living room was in disarray. Sims did not respond when Boone yelled her name, so Boone ran back to her landlord's residence and told him that something was wrong. The landlord then entered Boone's residence and discovered Sims' dead body.

Sims was found lying naked on her left side in a pool of blood on the bathroom floor. Her hands were bound tightly behind her back with part of an extension cord that was tied in four knots. Her body was covered in blood and there was blood splattered on the bathroom walls and floor. The living room and front bedroom were in disarray. There were blood stains on the bed sheets and the floor in the front bedroom. Sims' bloodstained clothes were on the floor in the living room and front bedroom.

Dr. Allen Stilwell, the forensic pathologist who performed the autopsy on Sims' body, testified that she had eight stab wounds on the front of her chest, three stab wounds on the right side of her back, one stab wound on her left upper arm, and defensive cuts on her hands and fingers. Stilwell believed that Sims sustained most of these stab wounds after her assailant tied her hands behind her back. Sims also had bruises on the bridge of her nose, her lips, and above the left side of her cheek and eye. Stilwell testified that these bruises were consistent with Sims being struck by a fist or by her falling and banging her head on the floor. He further testified that Sims had additional "tease wounds" which were inflicted by her assailant "to get her attention."[4] He testified

---

3. We note, however, that the factual sufficiency review process begins with the assumption that the evidence is legally sufficient under the *Jackson* test. *Clewis,* 922 S.W.2d at 134;

*Jones,* 944 S.W.2d at 647; *Santellan v. State,* 939 S.W.2d 155, 164 (Tex.Crim.App.1997).

4. Stilwell testified that the "tease wounds" were smaller wounds that were different than

that at least one of Sims' stab wounds caused hemorrhaging when it punctured a major artery and that other stab wounds caused her lungs to collapse which prevented her from breathing. He determined that Sims probably died from these injuries within two to four minutes after they were inflicted.

The forensic test results showed the presence of sperm on the oral and vaginal swabs taken from Sims's body. The DNA testing of appellant's blood and saliva samples revealed that appellant was the only individual who could have contributed the sperm found on Sims' oral swab.[5] In addition, appellant's fingerprints matched a bloody fingerprint found on Sims' tennis shoe.

Appellant gave a statement after his arrest. In his statement, he claimed that he was under the influence of "heavy drugs" on the night he murdered Sims. He stated that he was out walking when he saw Sims. He forced his way into the residence and "just ransacked her, just slung her all over the house in a violent rage." He remembered "stripping her down out of anger," tying her hands behind her back, and stabbing her with a knife, but he did not recall having sex with her. He could not remember if he brought the knife with him or what he did with the knife after he committed the murder. Appellant stated that he was "mad at the world" and that his drinking and drug abuse caused him to be paranoid and to have violent outbursts. He had the urge to "lash out" at two or three people that evening, but he acted on his urge when he encountered Sims.

Appellant argues that the evidence is insufficient because there is no evidence of planning, preparation, or premeditation. He contends that he came to the murder scene unarmed and was in a "blind rage" when he attacked Sims. A jury must find "a moment of deliberation and the determination [by] the actor to kill" before it is justified in answering "yes" to special issue number one. *Kinnamon v. State*, 791 S.W.2d 84, 95–96 (Tex. Crim.App.1990), *overruled on other grounds, Cook v. State*, 884 S.W.2d 485, 491 (Tex.Crim.App.1994). An act need not be premeditated to be deliberate, however, and the killing may occur during a "frenzy." *Havard v. State*, 800 S.W.2d 195, 212 (Tex.Crim.App.1989)(citing *Granviel v. State*, 552 S.W.2d 107, 122–23 (Tex.Crim. App.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977)). Further, this Court has recognized that whether or not a defendant comes armed to a crime scene is of probative value in proving deliberate conduct. *Cooks v. State*, 844 S.W.2d 697, 714 (Tex.Crim.App.1992), *cert. denied*, 509 U.S. 927, 113 S.Ct. 3048, 125 L.Ed.2d 732 (1993).

Appellant's repeated stabbing of Sims evidences a deliberate act with a reasonable expectation that death would result. *See Fearance v. State*, 620 S.W.2d 577, 584 (Tex.Crim.App.1980) (opinion on rehearing), *cert. denied*, 454 U.S. 899, 102 S.Ct. 400, 70 L.Ed.2d 215 (1981); *Granviel*, 552 S.W.2d at 123. Appellant's admitted anger and his urge to "lash out" is indicative of deliberateness. The evidence that he sexually assaulted Sims, tied her up, and

---

actual stab wounds because they just broke the skin and went into the soft tissue. There was a "tease wound" around Sims' right nipple which Stilwell testified could have been indicative of some type of sexual activity.

5. John Little, an investigator for the Wichita County District Attorney's Office, began investigating appellant as a suspect in the Sims case and obtained a saliva sample in January 1999. Appellant had already been convicted of the murder of Tina Kimbrew and was out on parole at that time.

stabbed her numerous times after he tied her hands behind her back also demonstrates deliberate conduct. Further, the evidence shows that appellant may have come armed to the crime scene. Appellant could not remember whether or not he brought the knife with him and the knife was never found.

Accordingly, the evidence was sufficient for the jury to find that appellant's conduct was deliberate and committed with the reasonable expectation that death would result. The jury's finding of deliberateness is not so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *Clewis,* 922 S.W.2d at 129. Appellant's first point of error is overruled.

## FUTURE DANGEROUSNESS SPECIAL ISSUE

■ In his second point of error, appellant claims the evidence is legally insufficient to support the jury's affirmative answer to the "future dangerousness" special issue. We review the evidence in the light most favorable to the jury's verdict to determine whether any rational trier of fact could have concluded beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.0711 § 3(b)(2); *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781.

■ The State introduced evidence that appellant murdered four more women in the two years following the murder of Terry Sims. Appellant's second victim was Toni Gibbs. On February 15, 1985, utility workers found Gibbs' nude body in a field in Archer County, a short distance from the Wichita County line. Gibbs had three stab wounds on her back, three stab wounds on her chest, and two defensive wounds on her left forearm and thumb.

DNA testing revealed that appellant's blood and saliva samples matched the sperm found on the vaginal smear taken from Gibbs' body.

Appellant admitted to the murder of Gibbs in his statement. He encountered Gibbs at about six o'clock in the morning, after he had been out walking all night. He knew Gibbs because she was a nurse at the hospital where he worked as a janitor. Gibbs offered him a ride and he "started seeing images of hatred and anger" after he got in her car. He began "slinging" her around in the car and screaming at her and forced her to drive down a dirt road to a field. He admitted that he removed Gibbs' clothing and stabbed her, but he could not remember if he had sex with her. He left the scene in Gibbs' car and abandoned it on a street off the side of the freeway.

Appellant's third victim was Debra Taylor, whose body was found in a field in Fort Worth on March 29, 1985. Taylor sustained blunt-force injuries to her head and face and her death was caused by manual strangulation. The medical examiner was unable to determine whether or not Taylor had been sexually assaulted. Appellant admitted in his statement that he strangled Taylor to death behind a Fort Worth nightclub and disposed of her body in the field.

Ellen Blau was appellant's fourth victim. A county road crew employee found Blau's body in a field in Wichita County on October 10, 1985. The state of decomposition was such that the doctor who performed the autopsy could only conclude that the cause of death was "undetermined homicidal violence." Appellant admitted in his statement that he abducted Blau from a parking lot and forced her to drive down a dirt road. He took her to a field and stripped off her clothes, but did not recall

if he raped her. He did not remember how she died, but stated: "She probably broke her neck because I was slinging her." Afterward, he drove back into town and abandoned her car.

Appellant's fifth victim was Tina Kimbrew, whose body was found on the floor of her ransacked apartment in Wichita Falls on May 6, 1986. Kimbrew had numerous bruises on her face, neck, and legs. Her nightgown was pulled up above her waist and her underwear was on the floor near her body; however, there was no evidence of recent sexual activity. The doctor who performed the autopsy concluded that Kimbrew was smothered to death. Appellant confessed to the murder of Kimbrew shortly thereafter.[6] He pleaded guilty to murder and was sentenced to thirty-five years in prison. He was released on parole in 1997.

The State introduced a penitentiary packet showing appellant's 1986 conviction and thirty-five year sentence for the murder of Tina Kimbrew. Appellant's prison disciplinary records contained in his penitentiary packet showed that he was disciplined in prison for creating a disturbance and fighting without a weapon. The State introduced additional evidence that appellant dropped out of school in the twelfth grade and that he was discharged from the Army National Guard after a period of six years due to his conduct and willful absences.

■ A jury is permitted to consider a variety of factors when determining whether a defendant will pose a continuing threat to society.[7] See Keeton v. State, 724 S.W.2d 58, 61 (Tex.Crim.App.1987). Although the Keeton factors are relevant, the circumstances of the offense "can be among the most revealing evidence of future dangerousness and alone may be sufficient to support an affirmative answer to that special issue." Wilson v. State, 7 S.W.3d 136, 142 (Tex.Crim.App.1999)(citing Bell v. State, 938 S.W.2d 35, 41 (Tex. Crim.App.1996), cert. denied, 522 U.S. 827, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997)). The murder of Sims in the instant case was particularly brutal. Appellant tied her up with an electrical cord, raped her, and stabbed her multiple times. Appellant also admitted to murdering four other women in the two years after he murdered Sims.[8] The evidence shows that appellant

---

6. Appellant traveled to Galveston after Kimbrew's murder, checked into a beachfront hotel, and called the police threatening to commit suicide. He confessed to the murder after the Galveston police responded to his call.

7. These factors include, but are not limited to: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the offense; (7) psychiatric evidence; and (8) character evidence. Keeton, 724 S.W.2d at 61.

8. Appellant argues that Keeton says the jury should consider only the existence of a prior criminal record in determining future dangerousness. He contends that the jury should not have considered the murders of Gibbs, Taylor, Blau, and Kimbrew because they were committed after the murder of Sims. The Keeton list, however, is not exhaustive. Barnes v. State, 876 S.W.2d 316, 322 (Tex.Crim.App.), cert. denied, 513 U.S. 861, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994). This evidence was certainly relevant to the jury's determination of future dangerousness. See Granviel v. State, 552 S.W.2d at 123 (evidence of future dangerousness was sufficient where defendant killed and raped other women in the four months after the instant offense); Allridge v. State, 850 S.W.2d 471, 489 (Tex.Crim.App.1991)(seven other aggravated robberies committed by the defendant after the instant offense and before his arrest were

raped and stabbed one of the four other victims and strangled two of them. He severely beat all of his victims. Further, the evidence showed that appellant was disciplined in prison and dishonorably discharged from the Army National Guard.

On this record, we cannot say that the jury's finding of future dangerousness is irrational. *See Jackson,* 443 U.S. at 319, 99 S.Ct. 2781. The evidence viewed in a light favorable to the jury's determination was sufficient to support an affirmative answer to the future dangerousness special issue. Appellant's second point of error is overruled.

We affirm the judgment of the trial court.

KELLER, P.J., concurs with ground one, otherwise she joins the remainder of the opinion.

---

indicative of future dangerousness), *cert. denied,* 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993); *Miles v. State,* 918 S.W.2d 511, 514 (Tex.Crim.App.1996)(defendant's

commission of armed robbery less than one month after the instant offense was evidence of future dangerousness).